[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This decision dissolves the nine-year marriage of Lily and Martin Secada. The principal issues before the court are whether the plaintiff may relocate to Florida with the parties' three minor children, joint versus sole custody, and the appropriate financial orders. The Judicial District of Stamford-Norwalk referred the case to the regional family trial docket for trial of these issues, held on ten days in January and February of this year. Each party testified and offered documentary evidence at trial. In addition, the court heard testimony from the following witnesses:
• The plaintiffs sister, Lourdes Garau;
• The defendant's sister, Rose Marie Secada;
• The defendant's personal and business accountant, Edward Drotman;
• The defendant's secretary, Debbie Kovach;
• Karen Riggio, an attorney representing the defendant's business,
• The court-appointed independent family relations evaluator, Dr. Jeffrey Von Kohorn, Ph.D.;[1] and
• The court-appointed guardian ad litem (GAL), Dr. Susan Freedland, Ph.D.;
The defendant also introduced into evidence a transcript of the deposition of the plaintiffs mother, Adella Hernandez. In addition, both parties and the GAL submitted claims for relief or proposed orders.
 I — FINDINGS OF FACT
The court has observed the demeanor of the parties and evaluated their credibility. The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. The court has carefully considered the statutory criteria for dissolving a marriage and entering orders regarding custody, visitation, child support, alimony, orders of life and health insurance and payment of the children's health expenditures, and the award of counsel fees. The court has fully considered the applicable legal and factual factors for determining whether to permit a parent, at CT Page 5059 the time of a dissolution, to relocate elsewhere with children from the marriage.
After making jurisdictional findings and a brief summary as to the background and situation of each party, the court will make findings as to the key issues here. As the causes of the marital dissolution are relevant here to the financial issues, the court will address the breakdown of the marriage first. As the conduct of the parties after their separation is important to considering the relocation issue, the court will discuss that next. Analysis of the relocation and financial issues will follow.
A. Jurisdictional Findings
The court finds that it has jurisdiction over the marriage. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married in Coral Gables, Florida, on February 14, 1993. They resided together as husband and wife for approximately six and one-half years. They have three minor children who are legal issue of the marriage: Mark Secada, born June 19, 1994; Giselle (Gigi) Secada, born August 24, 1995; and Cassandra (Cassie) Secada, born March 31, 1999. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state assistance. The marriage between the parties has broken down irretrievably with no reasonable hope of reconciliation.
B. The parties
The plaintiff is forty years old and disclosed no health problems in her testimony at trial. A graphic designer by training and profession, she has a bachelor's degree in fine arts from the University of Miami. Before the parties moved to Connecticut in April 1993, she was earning approximately $50,000 annually as a senior art director for a Florida advertising firm. After the move, the plaintiff obtained full-time employment in New York City but soon became pregnant. Because of frequent morning sickness, particularly during the trip to Manhattan from their rental home in Greenwich, and because she did not want to spend so much time commuting once the baby was born, she found part-time freelance graphic design work in Connecticut. After the birth of their first child, she continued working part-time, earning no more than $12,000 per year. The plaintiff stopped working altogether after Gigi was born in August 1995.
The defendant is thirty-nine years old and in good health. He received a baccalaureate degree in 1984 from the University of Pennsylvania in mathematics and computer science. After college, he obtained a masters in CT Page 5060 computer science from Drexel University, and then a Masters in Business Administration from the Wharton School at the University of Pennsylvania. In the 1990s he founded his own business, Secada and Company, which provides computer and internet consulting services to businesses and corporations. Initially organized as a sole proprietorship, in 1994 he converted it to a C corporation in which he owns all the stock. The business has been very successful, as reflected by the increase in its gross receipts in recent years — from $457,299 in 1997 to $1,573,271 in 1999 and $1,500,260 in 2001. As the business became more successful, the gross income that the parties reported annually to the Internal Revenue Service (IRS) also increased — from $90,000 in 1996 to $246,344 in 1997, $218,037 in 1998, and $199,899 in 1999. In 2000, after the parties separated, Mr. Secada reported gross income to the IRS of $271,333.
C. History of the relationship and causes of the marital breakdown
Although the parties knew of each other as teenagers, and their parents still reside within blocks of each other in the Miami area, they did not begin dating until August 1992, after which a whirlwind courtship ensued. Within a week they were living together and engaged, and they were married on the following Valentine's Day, February 14, 1993. The defendant was then employed as an analyst for the Ryder Company and the defendant as a graphic artist, both earning approximately $50,000 a year. At the time of marriage neither had significant assets, and both had substantial student loan indebtedness. In April 1993 they moved to Connecticut, where the defendant had found a better paying job; and once here he also started his consulting company.
By 1996, the defendant's consulting business was becoming increasingly successful. That year he obtained a consulting job in Switzerland, and, over the plaintiffs objection, he moved there and stayed for thirteen months. The plaintiff and children visited him there twice, once for a month and another time for three months, and the defendant also returned periodically to the US to see his family. The Switzerland trip is emblematic of many aspects of the parties' relationship during this midpoint in their marriage. It shows that the defendant was primarily focused on developing his business and the plaintiff was primarily responsible for their children. It also shows that the defendant's perceptions of events do not always take into account the moods and needs of his children.
One reason the defendant wanted to go to Switzerland was to take advantage of the cultural and travel opportunities that living in Europe offers. He became very emotional at trial while recounting the traveling the family did while there together and recalling what he perceived as CT Page 5061 the good time they had in doing so. The plaintiffs very different account of their time traveling together in Europe, on the other hand, shows her greater awareness of and sensitivity to the needs and moods of their children. She too testified that they traveled a lot, but she very credibly described how difficult doing so was with two young children. The parties argued frequently about how much time the children were spending in their car seats and when they would stop so the children could eat. For example, a nightmarish trip to Lugano ended up taking three times the planned length of two to three hours; since they had only planned a day trip, they had not packed for an overnight with the children and did not have enough diapers or food for the children. By the time they had found a hotel, gotten diapers for Gigi and milk for the children, it was late in the evening. When the plaintiff asked the defendant to ask the hotel' to warm the milk, he told her their child could go to sleep without any milk. Upon his return from Europe, the parties entered counseling with Dr. Jeffrey Cohen, whom they saw for several months at the end of 1997.
The last two years of the parties' time together, from the defendant's return to the United States in summer 1997 to their separation in September 1999, were marked by repeated infidelity and deceit by the defendant, much of which he admits. In summer 1998 the parties planned to take their children to California, where the defendant had an upcoming business trip. Shortly beforehand, the defendant persuaded the plaintiff that she and the children ought instead to visit her family in Florida. The defendant then took another woman to California for a month-long extramarital affair. In September, shortly after becoming pregnant with their third child, the plaintiff found out about the affair, and told the defendant she would not countenance marital infidelity. The defendant assured her that he wanted to preserve the marriage and promised he would be faithful. They decided to enter marriage counseling again, this time with Dr. Janice Abrahms-Spring, whom they saw together from October 1998 through mid-March of 1999.
When the defendant went back to Europe on another business trip in the fall of 1998, the plaintiff, no longer trusting him, inspected his home computer, where she found subscriptions to pornographic internet sites, bookmarks for escort services, and other computer files that showed his affair that summer had not been an isolated dalliance. She found that the defendant maintained a Yahoo email account where he kept the names of women and their measurements. She learned that earlier that year he had placed an advertisement on an adult internet web site. The profile that he posted of himself there stated that "Stay at home types bore me" and that he was "looking for" "a woman for erotic chat or email or a `discreet' relationship or 1-on-1 sex." (Pl. ex. 36.) When the plaintiff confronted him with her findings and accused him of having used escort services, he CT Page 5062 admitted doing so.
The defendant continued to be unfaithful to the plaintiff. On the day that their third child was born, he abandoned his wife and newborn just after the plaintiff had undergone the hazard of a caesarean section, and forwent the precious parent-child bonding time in the recovery room for a lunch date with a woman he had met in a bar. After learning about this, because she found an email to the defendant from that woman, the plaintiff asked the defendant to leave. She agreed to continue the marriage only after he again promised to be faithful. The defendant assured her that he loved her, wanted to work on the marriage, and would not cheat on her any more. Yet on a later occasion, after the defendant had told her he had been at a meeting in New York City, she found in his pants pocket a pharmacy receipt for condoms — which obviously were not for birth control with the plaintiff since she had already had a tubal ligation — and for a meal in a Westport Restaurant at the very time he had supposedly been in New York. Finally, at the first of September 1999, the defendant told the plaintiff he had to go to Florida for a short business trip. Suspicious, the plaintiff hired a private detective to follow him. While away, the defendant called the plaintiff and told her he was headed to the Miami airport on his way home. The plaintiff told him that the detective had just telephoned her to report that the defendant was actually at a restaurant with another woman. When the defendant acknowledged that fact, the plaintiff told him that the marriage was over and not to return home.
The defendant's explanation at trial for his conduct was quite matter of fact, and showed no sense of remorse. He said he had placed the internet ad "as a lark." He admitted frequenting strip clubs because his business clients did so. He acknowledged having said, at his deposition, that when he sees a woman, he estimates their measurements and justified his doing so by saying that he "imagines that most men do so." He even admitted keeping a written record of these measurements. He denied having been unfaithful more than once, despite admitting several dates with various women and being in the Miami bar with a woman. When asked at trial to explain the one affair he did admit, he complained that after Gigi was born in 1995, "intimacy levels" with his wife had dropped.
While acknowledging his infidelity, the defendant also blames the plaintiff as equally responsible for the deterioration of their relationship. He repeatedly claimed at trial that the plaintiff had engaged in a "basic" or "fundamental" "deception" by telling him before they were married that she came from a "normal family" and that one of her brothers had died accidentally. He testified that "I was in love with an image she had portrayed to me and she was pregnant." The plaintiff, on the other hand, testified credibly at trial that she had told the CT Page 5063 plaintiff during their courtship that her brother had been murdered. She said that he had told her that two of his brothers had died, one accidentally and the other from illness, and that the shared experience of having lost siblings had given them a common bond. He also complained at trial about other deceptions, some unspecified, on her part during the marriage. Although the defendant's expressions of anger and betrayal over his claim that his wife had deceived him appeared genuine at trial, the contradictory testimony he offered about what and when she told him about her family, the vagueness of his claims about other "deceptions" on her part, and the varied times he gave for when their marriage broke down all cast doubt on his testimony. No independent evidence corroborates either party's claim on this point, and each seems equally possible and plausible. The court therefore makes no credibility or factual findings as to what the plaintiff told the defendant before the marriage or the defendant's allegation of deception on her part.
The defendant also said that the defendant had been mean and vindictive to him during their marriage. Although he claimed that she hit him on four occasions during the marriage, the court does not find his testimony on this point credible. The other examples that he cited of her alleged vindictiveness are, while plausible, petty rather than shocking.
On balance, comparing the testimony of the parties, weighing their demeanor and credibility, and evaluating all the evidence, the court finds that the defendant's infidelity and deceit — having and concealing extramarital affairs, even after promising his wife he would cease doing do and after the parties participated in individual and couples counseling to heal the rift in the marriage — are the primary cause for the dissolution of the marriage.
D. Relationship between the parties since separating
The first year after the parties separated in September 1999 was marked by significant and repeated conflict and acrimony between the parties. As of Dr. Von Kohorn's initial custody evaluation in December 2000,
 [c]ommunication between the parties reflect[ed] a pattern of high intensity tension and conflict. . . . [They have] a relationship that is currently characterized by disrespect, mistrust, and high intensity conflict. There is a long history of communications reflecting hostility and significant difficulty with solving problems together.
(AMC ex. 1 at 3, 12.) Because of the intensity of this conflict and its effect on the children, Dr. Von Kohorn initially recommended that the plaintiff be allowed to move to Florida with the parties' children, for CT Page 5064 otherwise, he concluded,
 it is likely that all three children would suffer from exposure to the high conflict relationship that currently exists. . . . The likelihood of continued acrimony is great as well as subsequent harm to the children.
Id. at 13.
After Dr. Von Kohorn's first evaluation, communication and cooperation between the parties about child-related issues improved considerably. Yet while the parties have cooperated better regarding their children, deep conflict has continued between them. The plaintiff repeatedly made complaints to the police last summer about the defendant, and the defendant filed a report with DCF against her. Admirably, however, the parties heeded Dr. Von Kohorn's conclusion that continued exposure to their conflict would harm their children and have managed to shield the children from their ongoing discord.
Financial matters have been the principal battleground of the parties' strife since their separation, without significant diminution. Since the parties separated, the defendant has used his control over the parties' financial resources to harass and vex the plaintiff, to make it difficult for her to meet the children's needs, and to advantage himself in the eyes of the children. During their marriage, the defendant kept exclusive control of all the parties' assets. He was the sole owner of the business (Secada and Company), all its business accounts were under his control alone, and when the parties bought a family home in Stamford in 1996, he put title to the house in his sole name. The parties had a joint bank account, but the defendant also told the plaintiff that she had unlimited use of a corporate American Express credit card for family expenses and gave her permission to use a corporate checking account. When they separated in September 1999, the plaintiff had few assets in her own name other than approximately $5,000 remaining from money she had withdrawn from the business checking account in 1998.[2]
In mid-September 1999, without notice to the plaintiff, the defendant removed her right to use the AMEX credit card, which she learned about only after a grocery store declined to honor the card. Until the parties had separated, his secretary had come to the house monthly to pay family bills, and that stopped also. He also closed their joint checking account. From mid September until December 1999, the defendant doled out small sums of money to her. On December 20, 1999, the court ordered him to pay her $10,000 on the first of each month in unallocated child support and alimony. Over the next year he was often late in making the court-ordered payments, and by the end of 2000 was $12,000 behind. After CT Page 5065 the court reduced his pendente lite support order to $8,000 per month as of January 2001, the defendant was required to pay the home mortgage payment of $4,400 directly and the remaining $3,600 to the defendant by the first of each month. Again, he was repeatedly late and short in his payments — by the special masters mediation in Middletown in November 2001, he was more than $10,000 in arrears in payments owed to the plaintiff (including approximately $2,200 for that month).
The defendant's testimony at trial that the tardiness of his payments to the plaintiff resulted from cash flow problems is not credible, particularly considering the amounts of money he spent on activities with the children,[3] the sums of cash he received from the business as compensation, business expenses, and loans to shareholder,[4] and the vindictiveness he sometimes displayed toward her in financial matters.[5]
When Dr. Von Kohom asked him why he was late in his support payments, the defendant tellingly revealed the wilfulness behind his tardy payments when he explained that he could not be held in contempt unless he was more than 30 days late.
The defendant's repeated tardiness and arrearage in making his court-ordered support payments placed great emotional and financial stress on the plaintiff. She discontinued the housekeeper services the family had used since 1995. She could afford to take the children on very few special recreational, cultural, or enrichment outings, and had to discontinue some of their extracurricular activities. She had difficulty paying bills she incurred for herself and the children. She bounced checks. She had to borrow money from her family and relatives and, in addition, incurred legal fees for prosecuting the dissolution and enforcing the court-ordered support payments.
E. The children and their relationships with the parties
The oldest child, Mark, age seven, is a serious child who gets along well with adults. Along with his sister, Gigi, he attends a Catholic parochial school in Stamford. He sometimes acts out in school, but is not a major behavior problem there. Although his grades have been A's and B's, he has had difficulty in spelling, reading, and math and is currently reading below grade level. A teacher unfortunately called him "slow" in front of his classmates, as a result of which other children now sometimes tease him. Both parents are aware of and working on his academic problems. Gigi, a first grader, receives B's and C's in school. She has shown some manual motor skill problems, but is talented, creative, and has a good singing voice. She has self-esteem and image problems, particularly about her weight and academics. She too has experienced teasing from classmates, about her weight. Both older children receive tutoring funded by Title 1 since their academic CT Page 5066 performance is below grade level. Both parents volunteer at the older children's school and attend parent-teacher conferences. The youngest child, Cassie, still stays at home during the day with her mother.
Although the plaintiff was the children's primary caretaker before the parties separated, the defendant has become actively involved in their lives since then, particularly in the last year. Since the first parenting order in this case, on December 16, 1999, he has had visitation with Mark and Gigi on alternating weekends from Friday at 5 p.m. until Sunday at 5 p.m. He also has a mid-week visitation with them before and after school on Wednesdays; initially the Wednesday visitation ended at 7:30 p.m., but in May 2000 it also became an overnight. Cassie was less than six months old when the parties separated, and the defendant's only court-ordered visitation with her was only for a few hours on alternating weekends until she was a year old; in May 2000, he started seeing her for two hours on Wednesday and Thursday afternoons, and his alternating weekend time with her increased over a period of months to every other Sunday from 9 a.m. to 5 p.m.
After Dr. Von Kohorn's first custody evaluation recommended that the plaintiff move to Florida, the defendant increased his involvement in the children's extracurricular activities. He spent a lot of his time with the children doing sports and activities with them, taking them to New York or on other trips, working with the older children on their class work, and providing them with enrichment and cultural opportunities. As a result of his increased involvement in their lives, the children's closeness to and affection for him also increased. The children enjoy and benefit from the time they spend with their father. They also enjoy spending time with their paternal cousin, three and one-half year old Dante, who lives with his mother (the defendant's sister) in New York City and spends many weekends with them.
The court heard testimony from both parents, the guardian ad litem, and the court appointed psychologist on the relationship of the parties with their three children. The mutual love and affection between each parent and all three children were obvious from the testimony of the parties, the court-appointed psychologist, and the GAL. All three children are comfortable and relaxed with and have close attachments to both parents. The oldest child, Mark, is probably the closest of the three to their father, although there is no evidence that he is any closer to his father than his mother. He gets lots of attention from Mr. Secada on school and sports activities, and his mother does numerous projects with him. The middle child, Gigi, is also very close to her father, and does many activities with him, but she wishes that he understood "girl things" better and feels that her mother understands her better. The youngest child, Cassie, although close and loving to both parents, has, because of CT Page 5067 her young age, spent less time with Mr. Secada and has a much closer bond with and connection to her mother. The children know that their mother wants to move to Florida, but both older ones have expressed their desire to remain here. They want to be able to see both parents regularly.
Despite the close ties of the children with both parents, the court finds that it is strongly in their best interest that the plaintiff serve as custodial parent. The defendant loves them, is warm and affectionate toward them, is organized, structured, and goal-oriented[6] in his parenting style, and, as noted above, has a good relationship with them. Angry and self-absorbed,[7] however, he has also deprived them of needed financial resources or beneficial services as part of his financial harassment of the plaintiff. He lacks insight or empathy and is not always attuned to the children's emotional needs. The plaintiff has always had a loving and affection relationship with the children and, since each was born, has fully met all of their day-to-day needs. Compared to the defendant, moreover, she is more nurturing and supportive in her parenting style, more aware of the children's emotional and psychological needs, and more responsive to their overall needs.[8]
 II — THE RELOCATION ISSUE
The plaintiff seeks to relocate with her children back to the Miami area where she grew up. Her parents and siblings all live there. Her most significant job history occurred there and she has employment waiting for her there upon her return. The defendant adamantly resists her request. He has developed a close relationship with all three children and is actively involved in their life and activities. He instead seeks an order requiring the plaintiff to keep the children here.[9]
 A. Applicable law
This difficult question, the resolution of which will so dramatically affect both parents and all three children for years to come, is not a simple one to resolve. Under the recent decision in Ford v. Ford,68 Conn. App. 173, ___ A.2d ___ (2002), the court must, in considering relocation during a dissolution proceeding, base its decision, as with other. questions concerning custody and visitation of the minor children, on the best interest of the children involved, as required by general statutes § 46b-56 (b). In assessing their best interest, the factors set forth in Ireland v. Ireland, 246 Conn. 413, 717 A.2d 676
(1998), "may be considered as "best interest factors' and give guidance to the trial court, [but] they are not mandatory or exclusive" in relocation cases such as this arising in the initial judgment contest.Ford v. Ford, 68 Conn. at 184. CT Page 5068
As courts have pointed out in myriad decisions on relocation and other legal questions affecting children, the term "best interest of the child" may not have scientific precision, but it "does not lack metes and bounds." State v. Anonymous, 179 Conn. 155, 165, 425 A.2d 939
(1979)."Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment." Id. "The best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare." In re Diane W., Superior Court for juvenile matters, child protection session at Middletown (December 21, 2002). As our Supreme Court noted in Seymour v. Seymour, 180 Conn. 705,710, 433 A.2d 1005 (1980),
 the legislature was acting wisely in leaving the delicate and difficult process of fact-finding in family matters to flexible, individualized adjudication of the particular facts of each case without the constraint of objective guidelines.
The courts have cited many factors that may affect a child's "best interest," ranging from those recited in Ireland and its antecedents to others such as the child's interest "in sustained growth, development, well-being, and in the continuity and stability of [his] environment";Capetta v. Capetta, 196 Conn. 10, 16, 490 A.2d 996 (1985); the child's specific needs; the nature of the child's relationship with each parent; the degree of contact maintained with each parent; and the potential benefit or detriment of retaining that connection with each parent. See e.g. Seymour v. Seymour, 180 Conn. 710ff Janik v. Janik, 61 Conn. App. 175,181, 763 A.2d 65 (2000), cert. den. 255 Conn. 940, 768 A.2d 949 (2001);Rudolewicz v. Rudolewicz, CLT No. 39, p. 664, Superior Court, judicial district of Hartford-New Britain (October 6, 1986, Arena, J.); In making its decision here, this court has considered the body of case law regarding best interest, the specific facts of this case, the testimony and credibility of the various witnesses here, and the court's assessment and evaluation of the best interest of the three specific children affected here.
B. Discussion
The court has also fully considered the reports and testimony of Dr. Jeffrey Von Kohorn, the clinical psychologist appointed by the court with agreement of the parties to perform a custody evaluation, and the testimony of Dr. Susan Freedland, a clinical psychologist appointed as guardian ad litem by the court with agreement of the parties. Both Von Kohorn and Freedland recommended that the court disapprove the plaintiffs CT Page 5069 request to relocate as not in the children's best interest, and testified about the various factors each considered in reaching their opinions. While a court may take into consideration the opinion of a family relations counselor, Yontef v. Yontef, 185 Conn. 275, 281, 440 A.2d 899
(1981), in which capacity Dr. Von Kohorn here functioned, and that of the guardian ad litem, Janik v. Janik, 61 Conn. App. 181, the court is not bound by the testimony of either witness as to individual best interest factors or their opinion as to the ultimate issue here, whether the plaintiffs relocation to Florida is in the best interest of these children.
In Ford, for example, the Appellate Court expressly upheld the trial court's decision rejecting the recommendation against relocation by the guardian ad litem and court-appointed psychologist. "[A] trial court is not bound to accept the expert opinion of a family relations officer. . . . [A] trial court is free to rely on whatever parts of an expert's opinion the court finds probative and helpful." Ford v. Ford, supra,68 Conn. App. 190, citing Yontef v. Yontef, supra, 185 Conn. 281. "It is in the sole province of the trier of fact to evaluate expert testimony, to assess its credibility, and to assign it a proper weight." State v.Jarzbek, 204 Conn. 683, 706, 529 A.2d 1245 (1987), cert. denied,484 U.S. 1061 (1988). "It is the quintessential function of the finder of fact to reject or accept evidence and to believe or disbelieve any expert testimony . . . The trier may accept or reject, in whole or in part' the testimony of an expert." (Citation omitted.) Tartaglino v. Dept. ofCorrection, 55 Conn. App. 190, 195, 737 A.2d 993, cert. denied,251 Conn. 929, 742 A.2d 364 (1999). Keans v. Bocciarelli,35 Conn. App. 239, 241-42, 645 A.2d 1029, cert. denied, 231 Conn. 934,650 A.2d 172 (1994). "In weighing the testimony of an expert, the trier of fact may accept part of the testimony of an expert without being bound by all of the opinion of the expert." Johnson v. Healy, 183 Conn. 514,517, 440 A.2d 765 (1981), quoting United Aircraft Corporation v.International Assn. of Machinists, 169 Conn. 473, 490, 363 A.2d 1068
(1975), cert. denied, 425 U.S. 973 (1976).
Both the court-appointed psychologist and GAL grounded their opinions as to the children's best interest on the assumption that the plaintiff, whom both recommended as the residential parent, would be financially secure and stable living in Connecticut.[10] The court finds that assumption ill-founded, for a variety of reasons described in more detail below. Instead, the court finds that relocation to Florida is reasonable and necessary in order for the plaintiff to become financially secure and able to meet the needs of her children. First, many factors impair the plaintiffs ability to support herself while living in Connecticut. Her professional portfolio, which consisted of selected representative works, was destroyed by hurricane and flood damage several years ago and cannot CT Page 5070 be replicated; without it, she has no evidence or product to show her skill to potential employers. Without portfolio, and never having professionally demonstrated here the full range or extent of her artistic skill, she would have great difficulty finding suitable employment in this area.[11] In Florida, on the other hand, the plaintiff spent the most significant years of her professional career. She is well-regarded professionally there, where she has several pending job offers. Her bilingual abilities enhance her job prospects there much more so than here. She will be able to meet the financial needs of herself and her children there, even if the plaintiff is late or short in his court-ordered alimony or support payments.
Moreover, her child care responsibilities, including a small child still at home, the stress she experienced because of the defendant's irregular pendente lite financial support, and the limitations on her ability to find employment here limited her ability and justify her failure to seek work during the divorce proceeding. Were she to seek employment in this area, she would, in many ways, have to, at age forty, start her career all over again, working her way up from the bottom. The best career prospects for her here would be to seek employment in New York City; but the daily commute to Manhattan, if she were employed full-time, would keep her away from the children longer each day than would be in their present best interest. Although the court accepts the testimony of both plaintiff and defendant that the plaintiff is a skilled graphic artist, as several examples of her work introduced into evidence attest, it would nonetheless take time, an uncertain period of years, for the plaintiff to become financially self-sufficient if she continues to live in this region.
The plaintiff will thus be, if she continues to live in Connecticut, a financial vassal of the defendant for a considerable period of time. Yet the defendant's conduct during the entire course of litigation shows him to be untrustworthy and unreliable in his financial dealings with the plaintiff. The defendant was not candid in his financial disclosures to the court or plaintiff.[12] He was repeatedly late in his pendente lite payments to her. His conduct not only prevented her from having the financial resources to offer the children the same type and number of cultural, recreational, and enrichment activities as their father did, but impaired her ability to meet their day-to-day needs. He has been vindictive toward her — cutting off her ability to provide for herself and the children early in the divorce; instituting litigation against her by his business; and making certain pendente lite payments payable to the plaintiff in her birth name, while knowing that his doing so impaired her ability to negotiate those checks. The timing of his payments shows his continuing intent to vex her — often making them within days after due, hence waiting until after the court-ordered due CT Page 5071 date with the knowledge that such a delay would cause her stress and inconvenience, yet making payments before a court hearing could be scheduled where he might be subject to judicial sanctions for contempt.[13] The court thus finds that neither a standard alimony order of regular monthly payments nor a three-month alimony escrow as proposed by plaintiff would provide the plaintiff with sufficient financial security or economic peace of mind in the present case. Even Dr. Freedland concluded that it would not be in the children's best interest to remain in Connecticut if the plaintiff "was not feeling financially secure." Relocation is reasonable and necessary for the economic and emotional well-being of the plaintiff and her children.[14]
In assessing the impact of the proposed relocation on the children's contact with the defendant, the court notes that the defendant has both the means and opportunity to maintain frequent contact with them. His business often requires him to travel. The defendant is a creative, industrious entrepreneur who, over the course of a few years, has built a successful business. While the concentration of major financial and corporate entities in this region may offer his business more lucrative client prospects here than elsewhere, his internet consulting business has had clients in California, Florida, Europe, and Latin America. Nothing about the nature of his business limits its geographical reach. Even without Florida clients, he has sufficient financial resources to go there frequently to see his children, and, as the owner and chief operating officer of his business, sufficient control over his work schedule to do so. The court's orders regarding his parenting time will thus offer him comparable access to the children after their relocation as before.
The court thus finds that Mr. Secada will have substantial control in the future over the nature and frequency of his contact with the children. "[T]he feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements";Ireland v. Ireland, 246 Conn. 431; will be in his own hands. Relocation may reduce the frequency of Mr. Secada's midweek contact with his children. He may find it more difficult to attend school or extracurricular activities. Yet changes in the schedule of his contact with them do not necessarily translate into reduced quality or quantity of contact. He will still have an opportunity, should he desire to exercise it, to see them frequently and, in view of the court's orders regarding vacations, for substantial periods of time as well.
In evaluating the best interest of all three minor children, the court must consider many factors, not just their wishes. The court here has fully considered the stated preference of the older children not to CT Page 5072 move, but has done so in light of the remaining evidence and while applying the controlling legal standard of their best interest. They are not aware, and appropriately not, of the financial dimension to the question of their best interest. As they will live with their mother, their best interest is in many ways tied to hers.[15] Their best interest requires that the parent with whom they live be able to provide for them financially. If their mother is unable to support the children adequately, if continuing financial shenanigans by their father continue to vex her, and if, as a result, she is emotionally and financially insecure, such a condition would inevitably affect and harm the children.
Although the older children are anxious about relocation,[16] both have shown an ability to make friends and like to participate in school and extracurricular activities that can ease the social transition for newcomers. Although both older children have experienced some emotional trauma from their parents' separation and the ensuing conflict between the parties, will be saddened by moving away from their father, his relatives here, and their friends, and may have some initial difficulty acclimating themselves in Florida, the court finds Dr. Von Kohorn's testimony credible that the plaintiff will do a good job of helping them integrate into their new environment. The plaintiffs nurturing and supportive style will help the children through the transition. Although close to their father's relatives here, the children are also close to their extended maternal and paternal family in Florida. They have often been cared for by their maternal grandmother, on whom the plaintiff will sometimes rely for child care in Florida.
No single factor is controlling here. The court concludes, after weighing all the evidence, and considering all the factors relevant to the children's best interest, that the best interest of these three children is to relocate with their mother to Florida, where she can gain the financial and emotional security and well-being that she needs, that they need from her, and that is not likely to be available to her, or them, here. The children's own interests in their sustained growth, development, and well-being require that their custodial parent be able to offer them a secure and stable home life, unfettered by the financial instability and concerns she would likely endure by remaining here.
 III — PROPERTY AND FINANCIAL ISSUES
"There are three stages of analysis regarding the equitable distribution of each resource; first, whether the resource is property within Section 46b-81 to be equally distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution CT Page 5073 of the property between the parties." Krafick v. Krafick, 234 Conn. 783,792-93 (1995). The court finds that the business, Secada and Company, and all items listed as assets on each party's financial affidavit are property within the meaning of § 46b-81 and hence subject to distribution by the court.
A. The business, marital home, and other marital assets
The major assets of the parties are the defendant's business and the marital home. The parties introduced no credible evidence as to the value of the business. The defendant's testimony that the business has no present value is not credible. Even if it currently has small cash reserves and owes significant debts, its most significant assets are the expertise of the defendant and the reputation and good will of his business. Though there was no evidence as to the value of these assets, it is obvious that they have some value, simply from the success of the business, the number and location of its clients, and its continuing growth until the recent recession. Yet in the months since the plaintiff filed this action, the defendant has stripped the business of most of its cash assets and significantly increased its liabilities by virtue of the loans to shareholder (the defendant) it made. Moreover, the defendant used $60,000 from his IRA after the filing of this action to make loans to the business, thereby further increasing its indebtedness to him. There is thus, in some sense, little of value that the court could award to the plaintiff from the business. Yet there is no doubt that the defendant's financial future, in view of his expertise and business acumen, is a rosy one. Since the defendant is the sole owner of the business, most of its good will and expertise reside in him personally. Should the court award the plaintiff half the business, the defendant could easily start a new business.
The sole remaining asset of significance is the marital home,[17]
valued by both parties in their financial affidavits as worth $688,000 and having equity of $388,000. Since they are competent witnesses regarding value of real property they own; Bank of Southeastern Conn. v.Nazarko Realty G., 49 Conn. App. 452, 458, 714 A.2d 722 (1998); and they dispute neither figure, the court accordingly adopts those amounts as the value of the home and their equity in it. The plaintiff will need a significant amount of the equity in the home to relocate to Florida and establish a household there. A suitable home for herself and the children in Florida will cost up to $350,000. After considering all the evidence and the statutory factors, the court awards the plaintiff title in the marital home.
Most of the indebtedness of both parties directly relates to expenses and liabilities of (a) the business, (b) the parties' personal, family, CT Page 5074 and living expenses, and (c) the present litigation. Since the plaintiff relocated here to bear and raise their children, the defendant has been the principal source of support for both parties, and the sole source for several years. The plaintiff has had no income of her own since the mid-1990s. Upon her relocation to Florida, however, she will be able to procure part- or full-time employment.
B. Counsel and GAL Fees
The plaintiff has requested that the defendant pay counsel fees to her of $25,000 and assume responsibility for the GAL and AMC fees. The defendant requests that each party pay its own counsel fees and that they split the fees for the GAL and AMC. Pursuant to general statutes §46b-62, the court has authority to order payment of counsel, AMC, or GAL fees after consideration of "their respective abilities and the criteria set forth in section 46b-82." Moreover, the court must take care that its determination of this question does not substantially undermine its other financial orders.
 In determining whether to award counsel fees the trial court must consider the total financial resources of the parties in light of the statutory criteria The statutory criteria are to be applied in light of the following three broad principles: First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third where, because of other orders, the potential obligee has ample liquid funds, an allowance of counsel fees is not justified. If, on the basis of the total financial resources of the parties, the trial court concludes that denying an award of counsel fees would not undermine its purpose in making its prior financial orders, the court should allow each party to pay his or her own counsel fees.
(Citations omitted; quotations omitted.) Miller v. Miller,16 Conn. App. 412, 418, 547 A.2d 922 (1988).
The court has reviewed the attorneys fee affidavit of service submitted by counsel for the minor child and finds that a fair and reasonable fee for the services she performed is $59,186.61. The court finds that the guardian ad litem rendered professional services worth $26,900.
Taking into consideration all the statutory factors mandated by §46b-62, as elucidated by the Appellate Court in Miller v. Miller, the CT Page 5075 court awards no counsel fees to either party and orders them to divide equally the fees for AMC and GAL.
C. Life Insurance
The plaintiff has also requested an order that the defendant obtain a life insurance policy in the face amount of $500,000, with her as the primary beneficiary while he is under an obligation to pay support. The defendant has agreed, in his claims for relief, to provide such a policy for $250,000. There is no other evidence as to the cost of such insurance, or the insurability of the defendant. The court will thus order the amount to which the defendant has agreed.
D. Tuition
The parties have until now agreed to educate their children in Catholic parochial schools. The defendant has paid the children's school tuition during this proceeding and should continue doing so while the plaintiff and children still reside here. If the parties agree to continue educating any of the children in private or religious schools after the relocation to Florida, they shall equally split the tuition cost of such education while the children are in elementary or secondary school. SeeCarroll v. Carroll, 55 Conn. App. 18, 24ff, 737 A.2d 963 (1999).
 IV — ORDERS 
After considering all the statutory factors set forth in General Statutes § 46b-56 as to custody and visitation, § 46b-81 (c) as to equitable distribution of property, § 46b-82 as to alimony, §46b-84 as to support of a minor child, § 46b-215a-1 et seq., Regs. Conn. State Agencies as to child support,, and § 46b-62 as to counsel fees, together with applicable case law and the evidence presented here, the court hereby enters the following orders:
1. Dissolution of Marriage
The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. Parenting Orders[18]
a. The parties shall share joint legal custody of the three minor children, who will live with their mother, subject to the right of liberal and reasonable visitation with their father.
b. The plaintiff may relocate with her children to Florida after the CT Page 5076 present school year. She may select the date for the move, but must give the defendant thirty days advance written notice of the date.
c. Until the children relocate to Florida with their mother, the defendant will have parenting responsibility for the two older children each week from immediately after school on Wednesdays through Friday at 8:00 p.m. and, on alternating weekends, until Sunday night at 6:00 p.m. The defendant shall have parenting responsibility for the youngest child on Wednesdays from when he picks up the older children until 8:00 p.m., and on the same weekends as the older children. After their relocation to Florida, he may have weekday and weekend parenting responsibility for all three children under the same schedule as for the two older children before the move, provided he provides the plaintiff seven days advance notice of his intention to spend such parenting time with the children.
d. Until the children relocate to Florida, they shall spend one uninterrupted month in the summer with their father, but this period shall not, without the plaintiffs consent, include the last seven days before the mother and children relocate to Florida.
e. During school years after their move to Florida, the children will alternate school vacations between the two parents, and the father, if not living near the children, shall be entitled to six weeks continuing parenting time with the children during the summers. He shall notify the plaintiff by April first of each year of the six-week period for his summer parenting time; if he does not do so by then, the plaintiff may then designate the period. The mother may also have two one-week periods during the summer of exclusive parenting time.
f. The parties shall share the children's birthdays. They will alternate school holidays, except that holidays occurring during a parent's exclusive summer parenting time will not be counted in the alternating of holidays. The children shall spend the birthdays and holidays in the location where they live unless occurring during parenting time designated by the father in the preceding sub-paragraph. The children shall spend mother's day with the plaintiff and, if the defendant so requests seven days in advance, father's day with the defendant from 8:00 a.m. to 8:00 p.m.
g. For the Christmas/New Year's holidays, the parties shall divide the school vacation equally and shall rotate annually which parent the children spend Christmas eve and day with.
(1) If the defendant desires and is able to spend Christmas eve and Christmas day near where the children are living, the children shall spend Christmas eve until 10:00 Christmas morning with one parent, and the CT Page 5077 rest of Christmas day with the other parent; and shall alternate time with the children on New Year's Eve and Day in the same manner.
(2) Otherwise, for the Christmas and New Year's period, if the defendant does not elect to spend Christmas eve and Day near where the children are living, then the children shall spend Christmas eve and Christmas Day with one parent and New Year's Eve and New Year's Day with the other, and they shall divide equally the remainder of that vacation.
(3) For Christmas 2002, the children shall spend Christmas eve and morning with their father, in accordance with the provisions of the above two paragraphs.
(4) Each year the defendant shall notify the plaintiff by November 1st where he will be spending the Christmas holiday period so that both parties and the children can plan their Christmas holidays. If he does not do so by that time period, then the procedures of paragraph (2) directly above shall apply.
h. The schedule for parenting time during a school or summer vacation will override other orders regarding parenting schedules (except as specified in subparagraph (d) above).
i. Both parents shall have reasonable telephone contact with the minor children when the children are with the other parent. Reasonable shall mean at least one telephone call a day.
j. Both parents shall treat each other with respect and courtesy. Neither parent shall make any derogatory remarks about the other parent in front of the children or within their hearing. Each parent shall seek to foster a close, loving, respectful, and positive relationship of their children with the other parent and with other parent's extended family.
k. Both parties shall immediately notify the other of any serious or emergency health issues involving the child when any of them are with that parent, and shall keep the other party informed of routine health matters involving the child.
l. If the defendant intends to spend his parenting time with the children in Connecticut during their summer, Christmas, and other school vacations, the parties shall
(1) cooperate in making travel arrangements for the children,
(2) seek travel arrangements that reasonably balance the amount of time spent traveling with the cost of such travel, and CT Page 5078
(3) divide equally the reasonable expense for the children's travel.
3. Equitable distribution of property
Each party may retain, free and clear of the other, all assets listed on their respective affidavits, except as set forth below:
a. The court awards title in the marital home located at 6 Winding Brook Lane in Stamford exclusively to the plaintiff wife, free of any claim of the defendant. The defendant shall by quitclaim deed convey all of his right, title and interest in such property within thirty days of this decree. Except as further specified below in paragraph 4b, the plaintiff shall hereafter assume full responsibility for making all payments due after issuance of this decision for mortgage, taxes, or real property insurance on the property. She shall indemnify and shall hold the husband harmless on the mortgage or any obligations or expenses pertaining thereto.
b. The court awards title to the Lexus motor vehicle to the defendant and the Jeep Grand Cherokee to the plaintiff, free and clear or any claim of the other party. The defendant shall transfer title to the plaintiff for the Jeep Cherokee within thirty days of the date of this decision.
c. The evidence does not make clear if the parties have already divided all their personal property. The court retains jurisdiction over any such issues.
4. Financial responsibility for indebtedness
The defendant shall be responsible for paying all debts and liabilities located on his financial affidavit. Furthermore, he shall be responsible for paying and indemnifying and holding the defendant harmless from any of the following:
a. Federal or state tax liability or indebtedness arising during the term of this marriage, and any interest or penalties imposed thereon, and he shall indemnify and hold the defendant harmless thereon.
b. Any indebtedness or liability imposed on her as the result of litigation or claims brought against her by or on behalf of Secada and Company or vendors to or creditors of Secada and Company.
c. Any mortgage, tax, or property insurance payments owing or accrued on the marital home as of the date of this order. CT Page 5079
d. Any liabilities relating to maintenance or upkeep of the marital home before the first pendente lite order on December 20, 1999.
The court intends its orders in this and the next section to be in the nature of maintenance and support and hence, under present law, and to the extent that this court may determine it, nondischargeable in bankruptcy.[19]
5. Alimony and Support
a. Basic Orders
(1) The defendant shall pay the plaintiff unallocated alimony and child support on the first day of each month for a period of six years from the date of this decision in the following amounts:
(a) The defendant shall pay the sum of $9,000 per month on or before the first day of each month until the first month after both of the following have occurred:
i) the plaintiff has relocated with the children to Florida; and
ii) the defendant has irrevocably transferred to the plaintiff full title to and all his ownership interest in the house at 6 Winding Lane.
(b) After both events listed above have occurred, such payments shall be reduced to $7,500 per month.[20]
(2) Such payments shall terminate upon death of either party, remarriage of the plaintiff, or her cohabitation with a male pursuant to General Statutes § 46b-86 (b), except that: after six years, or upon remarriage of the plaintiff or such cohabitation with a male, the defendant shall pay to the plaintiff such child support as may be determined by a court of competent jurisdiction until the younger child reaches the age of eighteen or has graduated from high school, whichever is later, but in no event beyond that child's nineteenth birthday. Child support shall commence as of the date that alimony terminates.
b. Health insurance for the minor children
Under General Statutes § 46b-84 (f), the court dissolving a marriage must include provisions in the support order for health insurance coverage for any minor children.[21] The court orders the defendant to maintain health insurance coverage for the three minor children. CT Page 5080
c. Unreimbursed health-related[22] expenses and care expenses
The parties shall share equally the cost the children's unreimbursed medical expenses and health-related expenses (after the first one hundred dollars a year, which will be the responsibility of the plaintiff) and of child care expenses that are reasonable and necessary for the plaintiff to maintain employment.
d. Health insurance for the plaintiff
The defendant will cooperate with the plaintiff in ensuring that she has adequate and timely information so that she may elect whether to purchase COBRA health insurance for herself after this decision.
6. Life insurance
The defendant shall obtain a life insurance policy with a face amount of $250,000, naming the plaintiff as primary beneficiary and the three minor children as secondary beneficiaries as long as he remains legally obligated to pay alimony or child support.
7. Private school tuition
If the parties agree to continue keeping any of these children in private or religious schools, the defendant shall be responsible for paying for the tuition cost of such education while they still reside in Connecticut. After their relocation to Florida, the parties shall equally split the cost of such tuition while the children are in elementary or secondary school or, for a particular child, until that child turns age 19, whichever occurs first.
8. Tax exemptions
Beginning in 2002 (and 2001 if tax returns have not already been filed by both parties), the parties shall annually divide the child tax exemptions and child tax credits, two to the defendant and one to the plaintiff, until the parties are no longer able to claim such for all three children, after which they will split such credits and exemptions until eligible to claim such for only one child, after which they will alternate the exemption and credits so long as they exist. In the first year with only one such exemption, the defendant may claim the exemption and credit.
9. Fees for attorney for the minor children and guardian ad litem
The parties shall each be responsible for half of the GAL and AMC CT Page 5081 fees, and payments made by or on behalf of any party prior to this decision shall be credited toward that party's portion of the fee. The parties shall seek to negotiate a schedule for paying such fees with the AMC and GAL; but if they cannot come to a mutually satisfactory agreement with the AMC or GAL as to the schedule for such payment, the court retains jurisdiction to order a specific payment schedule.
BY THE COURT
_____________________________ STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT